**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

YUQING WANG,

               Plaintiff,

     vs.

EQUIFAX INFORMATION SERVICES,
LLC; EXPERIAN INFORMATION
SOLUTIONS, INC.; TRANS UNION, LLC;
VERIZON WIRELESS SERVICES, LLC;
and TRANSWORLD SYSTEMS INC.,

               Defendants.

Civil Case No.: 1:26-cv-01060

**COMPLAINT AND DEMAND**
**FOR JURY TRIAL**

      Yuqing Wang ("Plaintiff" or "Ms. Wang"), by and through the undersigned counsel, brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); Trans Union, LLC ("Trans Union") (collectively, the "Credit Bureau Defendants"); Verizon Wireless Services, LLC ("Verizon"); and Transworld Systems Inc. ("Transworld"); (all defendants collectively, "Defendants"), and states as follows:

<u>**INTRODUCTION**</u>

      1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

2

7.      The preservation of one's good name and reputation is also at the heart of the

FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all
> sorts of computerized data banks, the individual is in great danger of having his life
> and character reduced to impersonal "blips" and key-punch holes in a stolid and
> unthinking machine which can literally ruin his reputation without cause, and make
> him unemployable or uninsurable, as well as deny him the opportunity to obtain a
> mortgage or buy a home. We are not nearly as much concerned over the possible
> mistaken turn-down of a consumer for a luxury item as we are over the possible
> destruction of his good name without his knowledge and without reason.
> Shakespeare said, the loss of one's good name is beyond price and makes one poor
> indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)]

(emphasis added).

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine

whether information disputed by consumers is inaccurate and record the current status of the

disputed information, or delete the disputed information, before the end of the 30-day period

beginning on the date on which the CRA receives the notice of dispute from the consumer. This

mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate

information contained within a consumer's credit report is corrected and/or deleted so as to not

prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.      In light of these important findings and purposes, Congress specifically noted "a

need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and

respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other third party

that provides information about consumer to a CRA, upon notice, to conduct a reasonable

reinvestigation of all disputes with regard to the completeness or accuracy of any information it

provides to the CRAs regarding a consumer and modify, delete, or permanently block any items

of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiff's potential creditors that Plaintiff had failed to make payment on her account obligation during one or more months in the past two years and that Plaintiff's account was placed for collection as a result.

12.    Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.    Plaintiff also brings a claim against Defendant Verizon for failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

14.    Plaintiff also brings a claim against Defendant Transworld for using false, deceptive and misleading communications when attempting to collect a debt from Plaintiff when Transworld had knowledge that the debt was not owed by Plaintiff, in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e.

15.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

**PARTIES**

16.     Yuqing Wang ("Plaintiff" or "Ms. Wang") is a natural person residing in Queens, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

17.     Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of New York, including within this District.

18.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

19.     Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of New York, including within this District.

20.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

21.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of New York, including within this District.

22.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

23.     Defendant Verizon Wireless Services, LLC ("Verizon") is a national bank with its headquarters in New York and is authorized to do business in the State of New York, including within this District.

24.     Verizon is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b) and as defined in 12 CFR 1022.41. Verizon regularly furnishes information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report. A data furnisher, such as Verizon, is an entity that reports information about consumers to consumer reporting agencies ("CRAs"), which may include credit bureaus, tenant screening companies, check verification services, and medical information services, etc. Like CRAs and data users, data furnishers have legal obligations and rules that must be upheld and followed pursuant to 15 U.S.C. § 1681s-2(b) of the FCRA.

25.     Defendant Transworld Systems Inc. ("Transworld") is a "debt collector" and has legal obligations and rules that must be upheld and followed pursuant to 15 U.S.C. § 1692 of the FDCPA.

26.      Transworld has a principal place of business at 500 Virginia Drive, Suite 514, Ft. Washington, Pennsylvania 19034, and is authorized to do business in the State of New York, including within this District.

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

**A.    Summary of the Fair Credit Reporting Act**

29.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

30.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

31.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

32.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to

ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

33.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**B.    Factual Background**

34.    The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

35.    The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day and also sell credit scores.

36.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

37.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

38.    The Credit Bureau Defendants' consumer reports generally contain the following information:

(a)    Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)    Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)    Public Record Information: this section typically includes public record information, such as bankruptcy filings; and

(d)    Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

39.    The Credit Bureau Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

40.    The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

41.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Credit Bureau Defendants' consumer reports.

42.     The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

43.     FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

44.     The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

45.     The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

46.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

47.     The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

48.     The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

49.     The Credit Bureau Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

50.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

51.     Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures. Specifically, the Credit Bureau Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

52.     The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

**C.      Plaintiff's Verizon Account**

53.     On or about October 17, 2024, Plaintiff placed an online order with Defendant Verizon for a phone and new wireless phone line, with the intention of porting her phone number from T-Mobile to her new Verizon phone line.

54.     The Verizon account used an embedded SIM ("eSim"), and the wireless account was bundled with the new phone.

55.     Verizon charged Plaintiff for an initial payment of $124.25, with continuing monthly payments estimated in the amount of $121.92 over thirty-six months.

56.     On or about October 22, 2024, Verizon shipped Plaintiff's phone order via UPS. Plaintiff's initial payment for the phone was made with her account provider, Verizon, on October 23, 2024.

57.     After multiple unsuccessful delivery attempts between October 22 and October 28, 2024, the order had failed to be delivered, and it was returned to the sender, Defendant Verizon, on or about October 31, 2024.

58.     Having not received the phone, Plaintiff decided to not proceed with her purchase of the phone and phone line. Instead, Plaintiff placed a similar order for a phone and phone line, this time however as a sub-line under her partner's Verizon phone plan.

59.     On or about October 27, 2024, a Verizon bill for the account in question was sent to Plaintiff via email in the amount of $143.65 with a due date of November 15, 2024 (the "November 2025 Bill").

60.     Upon information and belief, on or about November 3, 2024, the $124.35 initial payment for the phone was refunded by Defendant Verizon.

61.     On or about November 9, 2025, Plaintiff's partner called Defendant Verizon and inquired about the bill generated for the account. Plaintiff's partner confirmed with Verizon that the returned phone had been received by Verizon, and Plaintiff's partner informed Verizon that all charges relating to that order – the phone and the service line – should have been canceled.

62.     At the time, on the phone, a Verizon representative assured Plaintiff's partner that everything will be canceled because the device is in Defendant Verizon's warehouse, that the bill was generated incorrectly, that Plaintiff did not have to do anything in relation to her account, and that Defendant Verizon will remove the bill at the end of the billing cycle.

63.     On or about November 16, 2024, Plaintiff's partner had a lengthy call with Defendant Verizon to port Plaintiff's number to a new Verizon account, under another person's name, and was successful in porting Plaintiff's number.

64.     During this call, Plaintiff's partner followed up *again* on the issue of Plaintiff's prior order and previously generated bill. *Again,* Plaintiff's partner was assured by a Verizon representative that the previously generated bill was a mistake and would be removed.

65.     Because Plaintiff did not maintain her own Verizon account at this time, and because the only account that she had briefly maintained had been terminated without her ever received the ordered phone, she should not have been receiving any billing statements or invoices from Verizon.

66.     However, on or about November 19, 2024, an updated bill for the account in question was sent to Plaintiff in the amount of $115.38, with $104.46 "[d]ue immediately" and $10.92 due by December 8, 2024.

67.     Because Plaintiff's partner was repeatedly assured by Defendant Verizon's representatives to not worry about Plaintiff's bill, Plaintiff was certain that the November 19, 2024, bill was outdated, and that Defendant Verizon had removed the bill or would remove the bill as Verizon had communicated in by phone.

68.     After the November 19, 2024, email from Verizon that contained a bill for the terminated account, no other communication about the terminated account was sent by Defendant Verizon until February 21, 2025.

**D.     Verizon Sent Plaintiff's Account to Collections with Transworld**

69.     In or around December 2024, Plaintiff received a letter via mail from PNC Bank in relation to her PNC Bank credit account stating that it was closing her PNC credit account on account of a change to her credit score.

70.     Plaintiff would later discover that, at this time, her credit score had been reduced by more than 100 points on account of Verizon placing a debt that she purportedly owed on her terminated account, in collections.

71.     Plaintiff was deeply disturbed and panicked by the PNC Bank letter. Aside from the ordinary credit concerns, Plaintiff was also concerned that a severe credit occurrence of the kind that caused PNC Bank to close her credit card may adversely affect her immigration status or future immigration status.

72.     On or about December 21, 2024, Plaintiff's partner called Defendant Verizon to follow up on regarding the terminated account. However, the Verizon representative mentioned issues accessing the account because it had already been sent to collections and, therefore, Plaintiff's partner was transferred to Defendant Transworld, a debt collector.

73.     Defendant Transworld advised Plaintiff's partner to open a dispute, which he did during the phone call.

74.     On or about December 31, 2024, Plaintiff's partner had two phone calls with Defendant Verizon about the status of the account.

75.     After further investigation on the part of Verizon, Plaintiff's partner was informed that Defendant Verizon would make sure to work with Defendant Transworld to remove the incorrectly generated bill and would work with the credit bureaus to remove the incorrect debt collection and overdue account.

76.     In or around January 2025, Plaintiff received a letter from Defendant Transworld, dated January 17, 2025, stating that she had a Verizon collection account with them, with a balance of $115.38 (Reference No. 30180612).

77.     Along with this letter, Transworld attached Verizon billing statements.

78.    After reviewing the Transworld letter, on January 29, 2025, Plaintiff's partner had another twenty-three-minute call with Defendant Verizon, asking for any updates regarding the terminated account in question.

79.    During the call, Plaintiff's partner was assured by a Verizon representative that the bill is incorrect and apologized for the trouble caused, especially for the incorrect negative information appearing on Plaintiff's credit reports.

80.    The Verizon representative told Plaintiff's husband that she would personally work on the case and ensure all the necessary letters are sent to credit bureaus to rectify this issue and that she would call Plaintiff's partner back in two to three business days after this has been completed.

81.    Neither Plaintiff nor her husband received any communication from Defendant Verizon during the following week.

82.    On or about February 6, 2025, Plaintiff received another collection notice from Defendant Transworld, dated January 29, 2025.

83.    On February 7, 2025, Plaintiff's partner called Defendant Transworld who communicated that Defendant Verizon indicated that the debt was valid and that Plaintiff owed the same amount as the collection account showed, which was $115.38.

84.    Shortly thereafter, Plaintiff's partner called Defendant Verizon to inquire about the purported validity of the debt and was on the phone with Verizon for approximately 20 minutes.

85.    Eventually, during the call, an individual from Defendant Verizon's finance department joined the call and informed Plaintiff's partner that Defendant Verizon confirmed that the debt is valid, and that the debt was particularly for the services provided to the wireless account, not the phone that had been returned.

86.     Defendant Verizon stated that although the phone had been returned to Defendant Verizon, the wireless account was opened, and the bill was generated for the wireless account, which became overdue and sent to collections. Plaintiff's partner disagreed with this finding but was told that there was nothing else Defendant Verizon can do about it, and that if he opened another dispute, the answer would be precisely the same.

87.     When Plaintiff's partner continued to try to reason, the Verizon representative hung up the phone.

**E.     Defendants Report that Plaintiff is Delinquent on One or More Payment Obligations and Placed for Collections as a Result**

88.     Plaintiff took her credit health seriously and was extremely concerned about any negative impact on her credit score.

89.     Plaintiff reviewed her credit reports from each of the Credit Bureau Defendants and learned that her Verizon account was reporting with an Account Status of "Collection," a $115 balance and "past due" balance.

90.     Upon information and belief, Defendant Verizon reported to the Credit Bureau Defendants that Plaintiff owed a past-due balance in relation to the terminated account and that her account had been placed for collection as a result.

91.     The Credit Bureau Defendants reported to Plaintiff's credit file and credit reports that Plaintiff owed an overdue and past-due balance in relation to the terminated account to Defendant Verizon and that her account had been placed for collection as a result.

92.     Plaintiff was confused and distressed by this information. Plaintiff knew, and had also been assured by Verizon, that she did not have any obligation or debt owed for the terminated account at issue, with Defendant Verizon.

16

93.     On or about February 21, 2025, Plaintiff called Verizon to once again inquire as to why Verizon was reporting that she owed a debt on the terminated account, which she did not owe.

94.     During that phone call, a representative from Verizon stated that the debt arose from a promotional charge for the phone that she had returned. After further inquiries, the representative went to confirm with a Verizon supervisor. The Verizon supervisor confirmed again that the charge should not exist because the phone had been returned and was in Verizon's warehouse. The representative issued a ticket to remove the charge and provided Plaintiff with the ticket number (1076966) and stated that Plaintiff should follow up with Verizon after five (5) days to confirm that the charge had been removed.

95.     On or about February 21, 2025, Plaintiff received an email from Verizon, stating that it had "successfully validated your order and it's now being processed. Click the button below to track your order status at any time."

**F.     Plaintiff's First Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

96.     On or about April 10-15, 2025, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff disputed the $115 balance and collection status associated with her account with each of the Credit Bureau Defendants, via mail.

97.     In her detailed, 20-page dispute mailed to each of the Credit Bureau Defendants, that included two typed pages of single-spaced text and another 18 pages of supporting documentation, Plaintiff explained and clearly articulated that any reporting that she owed a balance in relation to the terminated account with Defendant Verizon was inaccurate.

98.     In her dispute, Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and for each to send her a corrected copy of her credit report.

99.     Attached to her dispute, Plaintiff included a copy of her driver's license, a utility bill, and her complete Social Security number, date of birth, address, phone number, and name.

**G.    Defendant Equifax's Unreasonable Dispute Reinvestigation**

100.     Upon information and belief, Equifax sent Defendant Verizon an automated credit dispute verification ("ACDV") pursuant to Plaintiff's April 2025 dispute to Equifax.

101.     Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

102.     Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's April 2025 dispute.

103.     Thereafter, Defendant Equifax failed to correct or delete the $115 balance and collection status appearing in Plaintiff's credit file.

104.     Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered April 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**H.    Defendant Experian's Unreasonable Dispute Reinvestigation**

105.     Experian responded to Plaintiff's April 2025 dispute, on or about April 15, 2025, Experian responded that it would not investigate the dispute because the dispute "does not appear to have been sent directly by you or to be authorized by you."

106.     Plaintiff mailed another dispute to Experian on or about June 3, 2025, that was identical to her first dispute except that it was dated May 27, 2025, and that, again, included a copy of her driver's license, a utility bill, and her complete Social Security number, date of birth, address, phone number, and name.

107.    Upon information and belief, Experian sent Defendant Verizon an automated credit dispute verification ("ACDV") pursuant to Plaintiff's June 3, 2025, dispute(s) to Experian.

108.    Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute(s).

109.    Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's June 3, 2025, dispute.

110.    Defendant Experian also failed to conduct a reasonable reinvestigation, or any reinvestigation whatsoever, of Plaintiff's April 2025 dispute.

111.    Upon information and belief, Defendant Experian also received a dispute from Plaintiff, via mail, on or about May 19, 2025, that was identical to Plaintiff's April 2025 dispute to Experian.

112.    Thereafter, and despite receiving three disputes from Plaintiff, Defendant Experian failed to correct or delete the $115 balance and collection status appearing in Plaintiff's credit file.

113.    Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute(s) tendered in April, May, and June of 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

I.    **Defendant Trans Union's Unreasonable Dispute Reinvestigation**

114.    Trans Union responded to Plaintiff's April 2025 dispute, on or about April 16, 2025, stating that it would not investigate the dispute because the dispute did not appear to have been authorized by Plaintiff.

115.    Plaintiff mailed another dispute to Trans Union on or about June 2, 2025, that was identical to her first dispute except that it was dated May 27, 2025, and that, again, included a copy

of her driver's license, a utility bill, and her complete Social Security number, date of birth, address, phone number, and name.

116.    Upon information and belief, Trans Union sent Defendant Verizon an automated credit dispute verification ("ACDV") pursuant to Plaintiff's June 2, 2025, dispute(s) to Trans Union.

117.    Upon information and belief, Trans Union sent Defendant Verizon an automated credit dispute verification ("ACDV") pursuant to Plaintiff's June 2, 2025, dispute to Trans Union.

118.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

119.    Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's June 2, 2025, dispute.

120.    Thereafter, Defendant Trans Union failed to correct or delete the $115 balance and collection status appearing in Plaintiff's credit file.

121.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered June 2, 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

122.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered April 11, 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**J.     The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

123.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

124.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

125.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

126.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

127.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

128.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

129.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

130.    These ACDV "fields" have various titles for the many substantive areas into which

the Metro 2 codes can be entered.

131. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

132. The data furnishers, like Defendant Verizon, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

133. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**K.    Defendant Verizon's Unreasonable Dispute Reinvestigation**

134. Upon information and belief, in or about April of 2025, Defendant Verizon received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

135. Upon information and belief, Defendant Verizon failed to review all relevant information provided by Defendant Equifax regarding Plaintiff's dispute tendered in or about April 14, 2025.

136. Upon information and belief, Defendant Verizon verified the disputed information as accurate to Defendant Equifax on or about May 1, 2025, in response to the Equifax dispute.

137. Upon information and belief, in or about May and June of 2025, Defendant Verizon

received Defendant Experian's ACDVs and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

138.    Upon information and belief, Defendant Verizon failed to review all relevant information provided by Defendant Experian regarding either of Plaintiff's disputes tendered in or about May and June of 2025.

139.    Upon information and belief, in or about May and June of 2025, Defendant Verizon verified the disputed information as accurate to Defendant Experian.

140.    Upon information and belief, in or about June 2, 2025, Defendant Verizon received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

141.    Upon information and belief, Defendant Verizon failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's dispute tendered in or about June 2, 2025.

142.    Upon information and belief, in or about June 2025, Defendant Verizon verified the disputed information as accurate to Defendant Trans Union.

143.    Defendant Verizon violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

**L.    Defendant Transworld's Violative Collection Activities**

144.    Defendant Transworld was and is attempting to collect the purported Verizon debt that purportedly exists as a result of the terminated account from Verizon.

145.    In particular, on or about January 29, 2025, Defendant Transworld mailed a letter to Plaintiff that attempted to collect a debt in the amount of $115.38 that purportedly exists as a result of the Verizon terminated account.

146.    On or about January 17, 2025, Defendant Transworld sent mail to Plaintiff that purported to validate the Verizon debt that it was attempting to collect from Plaintiff.

147.    On or about February 7, 2025, during a call with Plaintiff's partner, Defendant Transworld demanded that Plaintiff pay the Verizon debt that it claimed was valid and verified by Verizon.

148.    Defendant Transworld has actual and/or constructive notice that Plaintiff disputed the Verizon debt that it was attempting to collect, when Plaintiff submitted multiple disputes to Defendant Transworld, directly and indirectly through Verizon, and, later, indirectly via Verizon as well as the Credit Bureau Defendants.

149.    Upon information and belief, Defendant Transworld is still attempting to collect the Verizon debt.

150.    Defendant Transworld violated the FDCPA by trying to collect on a debt by falsely representing the character, amount, or legal status of the debt that had been disputed by Plaintiff as not owed by her, in violation of §1692e(2).

151.    Defendant Transworld, as a debt collector, is well aware of the FDCPA.

152.    Defendant Transworld's violation of the FDCPA did not result from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such errors.

153.    As a result of Defendant Transworld's unlawful conduct, Plaintiff has been harmed.

154.    Each and every attempt by Defendant Transworld to collect the purported Verizon debt that purported to exist from the terminated account, caused Plaintiff distress, anxiety, and

frustration.

**M.    Plaintiff Suffered Additional Injuries**

155.    Plaintiff reasonably believes that Defendant Verizon continued to furnish data to the national credit bureaus inaccurately suggesting that Plaintiff had a past-due balance on a payment obligation owed to Defendant Verizon at some point in time between November and December of 2024, and that the debt was placed for collections.

156.    Plaintiff reasonably believes that the Credit Bureau Defendants continued to publish that Plaintiff owed a past-due balance on a payment obligation owed to Defendant Verizon at some point between November and December 2024, and that the debt was placed for collections.

157.    As a result of the inaccurate balance and collection status, and despite Plaintiff's the Defendants made it practically impossible for Plaintiff to continue to obtain credit, and in fact deterred Plaintiff from applying for credit.

158.    Indeed, Plaintiff's credit score had plummeted by more than 100 points, which led directly to the involuntary termination of her PNC credit card account. This severe credit impairment further damaged Plaintiff's financial standing by deterring her from seeking additional credit or favorable financing terms, as she reasonably feared that her diminished score would result in denials or predatory interest rates.

159.    To mitigate these issues, Plaintiff was forced to incur approximately $200.00 in out-of-pocket expenses to purchase credit reports and purchase credit monitoring subscriptions that she needed in order to monitor her evolving credit circumstances.

160.    Beyond these economic losses, Plaintiff suffered a substantial loss of time, spending at least ten hours engaged in fruitless communication with Defendant Verizon's representatives and Defendant Transworld. Over the course of three months, Plaintiff was

repeatedly subjected to misinformation, as Defendant Verizon's agents consistently provided false assurances that the matter would be resolved. This prolonged cycle of empty promises and the resulting financial uncertainty caused Plaintiff to endure significant stress, anxiety, and frustration, further compounding the harm caused by Defendants' negligence.

161.    On or about July 25, 2025, upon information and belief, Plaintiff applied for a credit account with Capital One and was approved but, upon information and belief, at less favorable terms due to the inaccurate reporting of the terminated account by Defendants.

162.    Additionally, on or about September 11, 2025, Plaintiff applied for a credit account with JPMCB and was approved but, upon information and belief, at less favorable terms due to the inaccurate reporting of the terminated account by Defendants.

163.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

164.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

165.    As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin.*

*Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

166.    The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

167.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
(First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

168.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

169.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

170.    On numerous occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

171.    Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

172.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

173.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

174.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

175.    As a result of Defendants' Equifax, Experian, and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

176.    Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an

amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

177.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

178.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

179.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id.*

180.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

181.    On at least one occasion during the past two years, Plaintiff disputed the inaccurate information with each of Equifax, Experian, and Trans Union and requested that each of them correct and/or delete a specific item in her credit file that was patently inaccurate, misleading, and highly damaging to her, namely, the reported balance, past-due balance, and the collection status reported about her payment history in relation to the terminated account with Defendant Verizon.

182.    In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or

such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

183.    In response to Plaintiff's dispute, Experian three times failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

184.    In response to Plaintiff's dispute, Trans Union twice failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

185.    The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

186.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

187.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent,

entitling Plaintiff to recover under 15 U.S.C. § 1681o.

188.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT III
### 15 U.S.C. § 1681s-2(b)
### Failure to Conduct an Investigation of the Disputed Information and Review All Relevant Information Provided by the Consumer
### (Only Claim for Relief Against Defendant Verizon)

189.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

190.    Defendant Verizon furnished the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

191.    Defendant Verizon violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute, or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

192.    As a result of Defendant Verizon's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct

the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

193.    Defendant Verizon's conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

194.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Verizon in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**
**Violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692**
**(Only Claim for Relief against Defendant Transworld)**

195.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

196.    Transworld violated the FDCPA by using false, deceptive and misleading communications when attempting to collect debts from Plaintiff when Transworld had knowledge that the debt was not owed by Plaintiff, in violation of §1692e. Specifically:

(a)    Transworld falsely represented the character, amount, or legal status of the debt that had been disputed by Plaintiff as not existing, in violation of §1692e(2).

(b)    Transworld' collection attempts and communications to Plaintiff in furtherance of such collection attempts contained information which it knew or should have known was false, in violation of §1692e(8).

(c)    Transworld' collection attempts further contained false representations and were a deceptive means to attempt to collect a debt or to obtain information

concerning Plaintiff, in violation of §1692e(10).

197.    As a result of Transworld' unlawful conduct, Plaintiff has been harmed. Each and every attempt to collect from Transworld, concerning the debt that Plaintiff had abundantly disputed, forced Plaintiff to relive and compound the pain, stress, and suffering from the consequences of being unfairly and wrongfully saddled with the nonexistent debt.

198.    Each and every attempt by Transworld to collect a debt caused Plaintiff distress, shock and frustration.

199.    Each and every attempt by Transworld to collect a debt caused Plaintiff to come to the devastating realization that no matter what Plaintiff did, Plaintiff will continue to suffer the consequences of being unfairly and wrongfully saddled with the nonexistent debt.

200.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to purportedly being a credit delinquent, financially reckless, and personally irresponsible.

201.    Additionally, Plaintiff has had to spend time and effort to attempt to undo the violative and false communications by Transworld that harmed her.

202.    Transworld's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1692k(a).

203.    Plaintiff is entitled to recover attorneys' fees and costs from Transworld in an amount to be determined by the Court pursuant to §1692k(a)(3).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

(1)     Determining that Defendants negligently and/or willfully violated the FCRA;

(2)     Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

(3)     Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA;

(4)     Determining that Defendant Transworld violated the FDCPA;

(5)     Awarding Plaintiff actual, statutory, and punitive damages as against Defendant Transworld as provided by the FDCPA;

(6)     Awarding Plaintiff reasonable attorneys' fees and costs as against Defendant Transworld as provided by the FDCPA; and

(7)     Granting further relief, in law or equity, as this Court may deem appropriate and just.

**DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: February 24, 2026                **CONSUMER JUSTICE LAW FIRM**

                                By:     */s/ Levi Y. Eidelman*
                                        Levi Y. Eidelman, NY Bar No. 5742499
                                        72-47 139th Street
                                        Flushing, New York 11367
                                        T: (718) 360-0763
                                        F: (480) 613-7733
                                        E: leidelman@consumerjustice.com

                                        *Attorneys for Plaintiff Yuqing Wang*